IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY MCCRARY, | § | |
| | § | No. 406, 2021 |
| Defendant-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1906013738(K) |
| STATE OF DELAWARE | § | |
| | § | |
| Appellee. | § | |

Submitted: October 12, 2022
Decided: January 13, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices, and **LASTER**, Vice Chancellor,[1] constituting the Court *en banc*.

Upon appeal from the Superior Court. **AFFIRMED.**

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for Appellant, Timothy McCrary.

John Williams, Esquire, Department of Justice, Dover, Delaware, for Appellee.

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

**VAUGHN**, Justice, for the Majority:

The Defendant-Below, Appellant, Timothy McCrary, appeals from his convictions in Superior Court of four counts of Unlawful Sexual Contact in the First Degree.  At the time of the commission of the offenses, the defendant was an aide at Harrington Head Start Preschool ("Head Start").  The four convictions involved three of the preschool students.  He raises three claims.  The first is that the trial court's admission of two, prior, out-of-court statements of one of the victims under 13 *Del. C.* § 3513 denied him his right to confront the witnesses against him in violation of the Sixth Amendment to the United States Constitution.  The second is that the Superior Court abused its discretion by admitting another victim's prior, out-of-court statement under 11 *Del. C.* § 3507 because the State failed to lay a proper foundation for the statement's admission.  The third is that the prejudicial effect of the errors deprived him of a fair trial.  For the reasons that follow, we have concluded that the defendant's convictions should be affirmed.

**FACTS AND PROCEDURAL HISTORY**

Timothy McCrary, known to students as "Mr. Tim," was a custodian, classroom aide and bus monitor at Head Start.  One of his duties as a classroom aide was to supervise the preschool children during their naptime.  At naptime, the children rested in their classrooms with blankets for thirty minutes.

On the evening of May 16, 2019, J.Y.,[2] a student at Head Start, was being bathed by her mother, Sarah Ford. J.Y. was five years old at the time.

During this bath, J.Y. made an initial disclosure that she had been touched inappropriately at school. Ms. Ford stated in her testimony at trial:

> Um, I was giving both my children a bath, my son also. And I was washing [J.Y.] and the next thing I know, like she freaked out -- I was washing her vagina area and she freaked out and just said, like, don't touch me there. And I paused and she said don't touch me there, that's where Mr. Tim touches me. And just I immediately backed off and said: What did you just say? And then she repeated it again, and I just literally got her out of the bathtub, soap and all, and ran to my mom's house and had her tell my sister what she just told me, because my mom's house is connected to my house. And she told my sister the exact same thing and --"[3]

After this, Ms. Ford called J.Y.'s father to come home. When he arrived, he asked J.Y. a series of questions in which he had her repeat the prior disclosure. He recorded this conversation. In the recording, which is a little less than five minutes in length, J.Y.'s father can be heard questioning a clearly distressed J.Y. beginning with "What did you tell mommy today . . . when you were in the bathtub?"[4] In the recording, he and Ms. Ford implore J.Y. to tell the truth. Ms. Ford can be heard saying "we need to know" and "You're not going to be in trouble. I promise. If it's the truth, you're

---

[2] The victims in this case are referred to by way of pseudonyms pursuant to Supr. Ct. R. 7(d).
[3] App. to Opening Br. at A19.
[4] Ct.'s Ex. 1 at 3.

not going to be in trouble."[5] J.Y. can then be heard insisting "[i]t is the truth."[6] After more back-and-forth, J.Y. again disclosed that the defendant had touched her inappropriately:

> [J.Y.'s father]: What'd you tell mommy while you were in the bathtub?
> J: Uh.
> [J.Y.'s father]: Tell me.
> J: My teacher (UI) with my gina.[7]
> …
> [J.Y.'s father]: What did he do?
> J: (UI) my gina.
> [J.Y.'s father]: He touched your gina? Does he touch anybody else's gina?
> S: Why does he touch your gina?
> J: (UI)
> S: Why did you tell me he touches your gina?
> J: I don't know.
> [J.Y.'s father]: What does he do to your gina, [J.Y.]? You have to be honest with us and tell us the truth.
> J: He puts, uh, he puts, uh--
> [J.Y.'s father]: He puts what?
> J: He puts lotion on his hand and when he (UI) on my gina.[8]

After J.Y.'s father conducted this interview, J.Y.'s parents took her to the hospital for a physical evaluation. The police became involved and J.Y. was formally interviewed at the Child Advocacy Center ("CAC") by forensic interviewer

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.* at 4.

Courtney Sheats.  This interview was recorded.  In her CAC interview, the following

exchange took place:

> CS:  Oh, okay.  And you said that the school was Head Start, and you don't go to school anymore.  How come you don't go to school anymore?
>
> JY:  It 'cause my bus driver.  My bus driver did private stuff on me.[9]
>
> …
>
> CS:  Ms. Linda is a girl.  Oh, okay.  Okay.  Well, and [J.Y.], I take notes on this page just to help me remember what we talk about today, okay.  Tell me about the private stuff Mr. Tim did on you?
>
> JY:  He put lotion on my hand.
>
> CS:  Put lotion on your hand.
>
> JY:  And then he rubbed it.
>
> CS:  Oh.  What did he rub?
>
> JY:  He rubbed my gina.
>
> CS:  Your gina.  Okay.  And [J.Y.], has that happened one time, or more than one time?
>
> JY:  More than one time.
>
> CS:  More than one time.  Tell me about a time that you remember the most.
>
> JY:  I remember all of it.
>
> CS:  You remember all of it. Tell me the first time?  Okay.  And you said that Mr. Tim put lotion on, was it your hand, or his hand, or something different?
>
> JY:  His hand.
>
> CS:  Oh, on his hand okay. And then what did he do after he put the lotion on his hand?
>
> JY:  He rubbed it, and then he put it in my gina.
>
> CS:  Oh, okay.  And put what in your gina?

---

[9] Ct.'s Ex. 2 at 4.

JY:    Lotion.[10]

These disclosures are consistent with those J.Y. initially made to her mother and father.

As a part of the investigation that commenced after J.Y.'s disclosure, the police reviewed security camera footage from classrooms at Head Start. One such video was introduced into evidence at trial. In the beginning of the video,[11] the students settled down for their daily rest time. The defendant entered the room and eventually sat down next to another student, A.L., while she rested on a mat with a blanket over her. A female employee is also visible in the classroom for much of the video. However, for a large portion of the rest time, the female employee was in an area near the door of the classroom where furniture obstructed her ability to see A.L. and the defendant.

In the video, the defendant remained seated next to A.L. for almost the entire rest period. On many occasions, he placed his hand underneath A.L.'s blanket. While his hand is not visible underneath the blanket, the angle and location of his arm indicate his hand was in the area of A.L.'s buttocks and vagina. The defendant's hand visibly moved under the blanket. Furthermore, when the female employee came closer to the defendant, he quickly removed his hand from underneath the

---

[10] *Id.*
[11] The video was just over an hour in length.

blanket every time. During a good deal of the time that his hand was under A.L.'s blanket, the defendant can be seen looking over his shoulder in the direction of the female employee or adjusting A.L.'s blanket so that it covered her and his hand.

The police contacted A.L.'s parents and explained what could be seen on the video. A recorded interview of A.L. was conducted by Ms. Sheats at the CAC. In her interview, A.L. did not disclose any inappropriate conduct on the part of the defendant. However, A.L.'s mother testified that following the interview, A.L. told her parents that the defendant had touched her inappropriately.

The Harrington Police Department published a press release concerning the claimed misconduct at Head Start. After the press release was published, L.F.'s mother reported to the police that L.F. had been abused. L.F. was four years old at the time. She was interviewed by Ms. Sheats. The interview included the following exchange:

> CS: Okay. And who goes on the bus with Ms. Linda? Okay. When you said that the boy teacher touches you or gives you touches that are not okay with you, did I get that right?
> LF: Yes.
> CS: Okay. Tell me about the touches that are not okay with you.
> LF: - - on my butt.
> CS: On your butt. Okay. And does the boy teacher give you touches on your butt?
> LF: Mm-hm.[12]

---

[12] Ct.'s Ex. 4 at 6.

7

L. F. disclosed to Ms. Sheats that these incidents occurred in the school and on the school bus. L.F. also told Ms. Sheats that the defendant instructed her to "keep it a secret."[13] They also discussed inappropriate touching of L.F.'s vagina:

> CS: Okay. Did the boy teacher touch a different part of your body at that time?
> Your cuckoo?[14] Okay. And the time that we are talking about, did he touch your butt -- or I'm sorry, did he touch your cuckoo the same day he touched your butt or a different day?
> LF: On the same day.[15]

Allegations concerning M.G., another Head Start student, were also reported to the Harrington police after the press release was published. During M.G.'s CAC interview with Ms. Sheats, M.G. made disclosures indicating that the defendant had touched her inappropriately underneath her pants, underwear, and shirt.

The defendant was charged by indictment with two counts of Sexual Abuse of a Child by a Person of Trust in the First Degree (both as to J.Y.) and six counts of Unlawful Sexual Contact in the First Degree (two counts each as to A.L., L.F., and M.G.).

The defendant was tried by the Superior Court at a bench trial in September 2021, more than two years after the occurrence of the offenses. He challenged the

---

[13] *Id.* at 8.

[14] When discussing names for parts of the body, Ms. Sheats circled a part of the body on a diagram and offered L.F. the option to refer to it as a "vagina or a cuckoo." *Id.* at 4. L.F. decided to call it a "cuckoo." *Id.*

[15] *Id.* at 8.

admissibility of the recorded statements J.Y. gave to her father and to Ms. Sheats. The State sought their admission under 13 *Del. C.* § 3513. Section 3513 allows, in pertinent part, for the admission of an out-of-court statement made by "a child victim . . . who is under 11 years of age at the time of the proceeding concerning an act that is a material element of the offense relating to sexual abuse"[16] where "[t]he child is found by the Court to be unavailable to testify"[17] because of "[t]he child's total failure of memory[,]"[18] and "[t]he child's out-of-court statement is shown to possess particularized guarantees of trustworthiness."[19] The statute sets forth 13 factors which the trial court may consider in deciding whether a statement possesses particularized guarantees of trustworthiness.[20]

On the witness stand at trial, J.Y. was unable to recall the events relevant to the charges or give any meaningful testimony. She stated that she did not recall where she attended preschool or a teacher named "Mr. Tim."[21] The trial judge found that J.Y. experienced a "total failure of memory"[22] and was, therefore, "unavailable"[23] as defined under Section 3513. Defense counsel did not take issue

---

[16] 11 *Del. C.* § 3513(a).
[17] 11 *Del. C.* § 3513(b)(2)a.
[18] 11 *Del. C.* § 3513(b)(2)a.3.
[19] 11 *Del. C.* § 3513(b)(2)b.
[20] *See* 11 *Del. C.* § 3513(e).
[21] App. to Opening Br. at A22.
[22] *Id.* at A24.
[23] *Id.*

9

with the finding that J.Y. was "unavailable." Counsel argued, however, that the statements were inadmissible because they lacked "particularized guarantees of trustworthiness."[24] The trial judge overruled the defense objection and found that both statements did possess "particularized guarantees of trustworthiness."[25] Both statements, were, on that basis, admitted. Defense counsel did not raise the confrontation argument the defendant now makes on appeal.

The defendant also objected to the admission of L.F.'s recorded CAC interview. The State sought to have that interview admitted under 11 *Del. C.* § 3507. On direct examination of L.F., after some preliminary questions, the prosecutor began a line of questioning which established that L.F. rode the bus to preschool, and that there were two grownups on the bus. L.F. explained that one was a female who drove the bus. She testified that the other was a "boy."[26] When asked whether the "boy" was in the courtroom, L.F. identified the defendant by pointing him out. L.F., however, also struggled to recall details, and her testimony was not entirely consistent. She testified that she did not like the defendant, but did not know why. She did not remember his name. When asked whether she had ever talked with anyone about the defendant, she answered "No."[27] When shown a photograph of

---

[24] *Id.* at A29.
[25] *Id.* at A31.
[26] *Id.* at A59.
[27] *Id.* at A61.

herself with Ms. Sheats, she testified that she did remember being in the photograph. When asked what she was doing when the photograph was taken, she replied that she did not know. As questioning continued, she testified that she remembered speaking with Ms. Sheats, but did not remember what they talked about. She did remember that she told Ms. Sheats the truth. When then asked whether she had talked with Ms. Sheats about "bad touches"[28] she said "Yes."[29] When asked whether she talked about a person when she talked about bad touches, she responded "Yes."[30] When then asked who the person was, she responded "I don't know."[31] Under further questioning, she repeated that she talked about bad touches, but upon being asked again whether she talked about bad touches, said "I don't know."[32] The prosecutor was unable to elicit from L.F. a connection between the bad touches and the defendant.

The State moved the admission of L.F.'s CAC interview at the conclusion of the direct examination. Defense counsel objected on the ground that the State failed to satisfy Section 3507's foundation requirement that the witness' direct examination should touch on the events perceived and the out-of-court statement itself. The court overruled the objection and admitted the recording of the interview. Defense

---

[28] *Id.* at A65.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at A66.

11

counsel did not ask any questions of L.F. on cross-examination.

The trial judge found the defendant not guilty of both counts of Sexual Abuse of a Child by a Person of Trust First Degree (as to J.Y.). Under the first of those two counts, however, the trial judge found the defendant guilty of the lesser included offense of Unlawful Sexual Contact in the First Degree. The trial judge also found the defendant guilty of three of the charged counts of Unlawful Sexual Contact in the First Degree (two counts as to A.L. and one count as to L.F.) The trial judge found the defendant not guilty of one of the counts of Unlawful Sexual Contact in the First Degree as to L.F. and not guilty to both counts as to M.G.

## DISCUSSION

### I. The Defendant's Right to Confrontation Was Not Violated

The defendant's first claim is that the admission of the statements J.Y. made to her father and to the CAC forensic interviewer under 11 *Del. C.* § 3513 violated his right to confrontation under the United States Constitution.[33] Since the

---

[33] Opening Br. at 8. In his Opening Brief, the defendant made both a facial challenge to 11 *Del. C.* § 3513 under the Confrontation Clause as well as a challenge to the application of the Confrontation Clause to the relevant facts. *Id.* at 14, 18. At oral argument en banc, this Court asked the defendant's counsel:

> So . . . let's turn to facial unconstitutionality . . . why isn't the fact that the statute could be applied to nontestimonial evidence enough to save the facial invalidity of the statute, and, if we agree, as the State I think has conceded, that, that there is a testimonial piece of this that as applied it might be unconstitutional, why do we even need to reach the facial challenge? Oral Argument 17:08-17:37.

12

Confrontation Clause argument the defendant makes here was not made in the trial court, we review this claim for plain error. "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[34] "[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[35]

Section 3513, known as Delaware's "tender years statute,"[36] is a hearsay exception specially crafted to allow into evidence out-of-court statements of child witnesses or victims pertaining to abuse.[37] The statute provides, in relevant part:

> (a) An out-of-court statement made by a child victim or witness who is under 11 years of age at the time of the proceeding concerning an act that is a material element of the offense relating to sexual abuse . . . that is not otherwise admissible in evidence is admissible in any judicial proceeding if the requirements of subsections (b) through (f) of this section are met.
> (b) An out-of-court statement may be admitted as provided in subsection (a) of this section if:

---

In response, defendant's counsel conceded that reaching the facial challenge was unnecessary, stating: "Your honor . . . I know that was argued in the brief and I do think that, uh, at this point, we don't need to reach the facial unconstitutionality. . . of the . . . argument[.]" *Id.* at 17:37-17:47. In light of this, we consider the defendant's constitutional challenge to the application of Section 3513 to these facts, but need not address the facial unconstitutionality argument.

[34] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (en banc).

[35] *Id.*

[36] *McGriff v. State*, 781 A.2d 534, 537 (Del. 2001) (en banc), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).

[37] *See* 11 *Del. C.* § 3513.

(1) The child is present and the child's testimony touches upon the event and is subject to cross-examination rendering such prior statement admissible under § 3507 of this title; or

(2)a. The child is found by the court to be unavailable to testify on any of these grounds:

. . .

   3. The child's total failure of memory;

. . .

   b. The child's out-of-court statement is shown to possess particularized guarantees of trustworthiness.[38]

In short, Section 3513 requires (1) that the witness be unavailable and (2) that the statement contain "particularized guarantees of trustworthiness" unless otherwise admissible on the grounds of Section 3507.[39] In this case, the State's argument that J.Y. was unavailable rested solely on the statutory ground that she showed a total failure of memory. The defendant argues that admitting J.Y.'s prior, out-of-court statements violated the Confrontation Clause because he "did not have an opportunity to cross-examine J.Y. during either recorded out-of-court

---

[38] 11 *Del. C.* § 3513.

[39] 11 *Del. C.* § 3513(b)(2)a., b. The defendant compares the requirement of "particularized guarantees of trustworthiness" factors outlined in 11 *Del. C.* § 3513 to the "reliability test" set forth by the United States Supreme Court in *Ohio v. Roberts*, which was eventually abrogated by *Crawford v. Washington*. Opening Br. at 15-17; *see Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980), *abrogated by Crawford*, 541 U.S. at 60, 68-69. This argument is without merit for two reasons. First, the defendant has not asserted that the admission of J.Y.'s CAC interview and her statement recorded by her father failed to comply with Section 3513; the defendant argues that the admission of those statements in compliance with Section 3513 violated the Confrontation Clause. Second, the defendant's arguments pertaining to the statute's similarity to *Roberts* are irrelevant to whether the admission of J.Y.'s statements satisfy the requirements of *Crawford*. Therefore, we need not address the "particularized guarantees of trustworthiness" factors reviewed by the Superior Court in consideration of the admission of J.Y.'s statements under Section 3513. *See* 11 *Del. C.* § 3513.

14

statement."[40]

The Sixth Amendment to the United States Constitution provides for the right to confrontation: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"[41] The United States Supreme Court has referred to this right as a "bedrock procedural guarantee"[42] and defined its purpose: "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused.[43]

The United States Supreme Court in *Crawford v. Washington* addressed the issue of admission of out-of-court statements and their intersection with the right to confrontation.[44] In that case, the Court established two requirements for the admission of such statements: "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[45] The Court elaborated in a footnote, explaining:

> [W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements . . . . The

---

[40] Opening Br. at 9, 25.
[41] U.S. Const. amend. VI.
[42] *Crawford v. Washington*, 541 U.S. 36, 42 (2004).
[43] *Id.* at 50 (emphasis in original).
[44] *Id.* at 40, 42.
[45] *Id.* at 53-54.

Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.[46]

The Court further explained that the Confrontation Clause applies only when a statement is testimonial in nature.[47] As the Court stated, "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."[48] In *Davis v. Washington*, the United States Supreme Court explained what it means for a statement to be testimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[49]

In *Ohio v. Clark*, the United States Supreme Court addressed the possible testimonial nature of out-of-court statements that were made to persons other than law enforcement officers.[50] While asserting that statements such as these are "much less likely to be testimonial,"[51] the Court applied the "primary purpose test,"[52] a

---

[46] *Id.* at 60 n.9
[47] *Id.* at 68; *Davis v. Washington*, 547 U.S. 813, 821 (2006).
[48] *Crawford*, 541 U.S. at 68.
[49] 547 U.S. at 822.
[50] *Clark*, 576 U.S. at 246.
[51] *Id.*
[52] *Id.* at 246-48.

standard which it called "a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause."[53] In this case, the State concedes that J.Y.'s CAC statement was testimonial.[54] We accept this concession, and therefore have no further need to discuss when a statement is or is not testimonial. Since the CAC statement is testimonial, Confrontation Clause concerns must be addressed.[55]

The defendant's Confrontation Clause claim must fail because J.Y. was available for cross-examination by defense counsel. The defendant claims that the Superior Court "denied McCrary the opportunity to cross examine [J.Y.]."[56] The record, however, does not support this claim. In fact, J.Y. was cross-examined by defense counsel at trial.

At trial, J.Y. took the stand and was placed under oath. After her direct examination, the witness was passed to the defendant's trial counsel. The following exchange occurred between the defendant's trial counsel and J.Y.:

> **BY MR. BARBER:**
> **Q.** Hi, [J.Y.].
> How are you today?
> **A.** **Good.**
> **Q.** A little bit nervous?

---

[53] *Id.* at 246-47.

[54] Answering Br. at 21.

[55] *Davis v. Washington*, 547 U.S. 813, 823-24 (2006). Since we ultimately hold that the defendant's confrontation rights were not violated by the admission of J.Y.'s testimonial CAC statements, we need not consider the issue of J.Y.'s statements, testimonial or non-testimonial, in her father's recorded interview.

[56] Opening Br. at 18.

17

**A.** (Nodded head.)

**Q.** Yeah.

**MR. BARBER:** I don't have any other questions, Your Honor.[57]

While this cross-examination was brief, and although defendant's trial counsel asked no questions specifically pertaining to an inappropriate touching, that was the tactical choice that counsel made. J.Y. was on the stand and available for cross-examination. Defense counsel could have asked J.Y. a series of questions designed to demonstrate her failure of memory, whether about the inappropriate touching or about other relevant matters. Defense counsel elected not to pursue any lines of inquiry. He chose to end the questioning when he did.

The United States Supreme Court has held that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[58] In *United States v. Owens*, the Court explained that "[o]rdinarily, a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions."[59]

To be sure, "limitations on the scope of examination by the trial court or assertions of privilege by the witness" may prevent cross-examination from being

---

[57] *Id.*

[58] *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original) (citing *Ohio v. Roberts*, 448 U.S. 56, 72 n.12 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004)).

[59] 484 U.S. 554, 561-62 (1988).

meaningful.[60]  The same reasoning does not apply to a failure of memory, which the United States Supreme Court has held does not render cross-examination ineffective.[61]  The Court provided the reasoning for the distinction in *Delaware v. Fensterer*:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness . . . .  To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness's testimony.[62]

In other words, the cross-examiner has had the opportunity to cross-examine if the cross-examiner can ask questions that illustrate the witness's lack of memory.

In *Randolph v. State*, this Court applied these principles when evaluating whether a defendant had an opportunity to cross-examine a witness under *Crawford*.[63]  The defendant in *Randolph* appealed a juvenile delinquency proceeding, in part, on grounds that admission of the victim's out-of-court statements under 11 *Del. C.* § 3507 violated his confrontation rights.[64]  In support of a Confrontation Clause argument, the defendant claimed that the victim, who

---

[60] *Id.*
[61] *Fensterer*, 474 U.S. at 21-22.
[62] *Id.*
[63] *See* 878 A.2d 461, 2005 WL 1653635, at *2-3 (Del. June 30, 2005) (ORDER).
[64] *Randolph*, 2005 WL 1653635 at *1-2.

testified at trial, "was unavailable and not subject to cross-examination because she had difficulty answering questions and most of her responses on direct examination were nonsensical."[65] In affirming the Family Court's decision below in admitting the statements, this court reasoned:

> In *Crawford*, the United States Supreme Court did "not expressly require any specific quality of cross-examination…."[66] All that is required is that a defendant have the opportunity for effective cross-examination of the declarant, not effective cross-examination in whatever way and in whatever manner a defendant may wish. In the present case, [the victim] was available for cross-examination and defense counsel made a strategic decision not to pursue cross-examination. Moreover, the mere fact that [the victim] had difficulty answering questions and provided nonsensical responses on direct examination does not make her unavailable for confrontation clause purposes.[67]

This Court also has found that memory problems do not result in a witness being unavailable for cross-examination, stating in *Johnson v. State* "[t]he mere fact that [the witness]'s recollection was limited does not make her unavailable for cross-examination for Confrontation Clause purposes."[68] Instead, this Court held that "when a witness takes the stand at trial, and is subject to cross-examination, the

---

[65] *Id.* at *2.

[66] *Id.* at *3 (quoting *Burke v. State*, 484 A.2d 490, 494 (Del. 1984), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004) (quoting *Johnson v. State*, 338 A.2d 124, 127 (Del. 1975))) (footnote omitted).

[67] *Randolph*, 2005 WL 1653635 at * 3 (footnote omitted).

[68] 878 A.2d 422, 429 (Del. 2005).

traditional protections afforded under the Confrontation Clause are satisfied."[69]

Like the testimony of the victim in *Randolph*, J.Y.'s in-court testimony was unhelpful to the defendant, but that does not mean that the defendant was denied the right to confront her. The defendant's trial counsel had the opportunity to question J.Y. The record shows that J.Y. had failures of memory regarding the events at issue, but under the decisions of the United States Supreme Court and this Court, a failure of memory does not prevent effective cross-examination. The defendant's trial counsel could have questioned J.Y. in a manner that emphasized her lack of recollection. The defendant's trial counsel chose not to question J.Y. A decision not to question is not the same as a denial of the opportunity for cross-examination.

We find that the defendant was not denied the right to cross-examine J.Y. Accordingly, we find that no violation of the Confrontation Clause with respect to the admission of J.Y.'s out-of-court statements.

## II. Admission of L.F.'s Statements Under 11 *Del. C.* § 3507 Was Proper

The defendant's second claim is that the Superior Court erred by admitting L.F.'s prior, out-of-court, CAC statement under 11 *Del. C.* § 3507 without requiring the State to satisfy one of the foundational requirements.[70] This Court reviews "a trial court's ruling admitting or excluding evidence for abuse of discretion."[71] "An

---

[69] *Id.* at 428-29.

[70] Opening Br. at 27.

[71] *Milligan v. State,* 116 A.3d 1232, 1235 (Del. 2015).

abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[72]

11 *Del. C.* § 3507 provides, in pertinent part, as follows:

> (a)    In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.
> (b)    The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not.  The rule shall likewise apply with or without a showing of surprise by the introducing party.[73]

The defendant contends that "the State failed to elicit any testimony from L.F. [on direct examination] about the events she allegedly perceived."[74]   This, the defendant contends, violates the statutory foundational requirement that there should be a direct examination of the witness who made the statement and that the direct examination should touch upon the events perceived by the witness and the out-of-court statement itself.[75]

The requirement that in order to use a Section 3507 statement at trial, there should be a direct examination of the witness who made the statement that "touch[es]

---

[72] *Thompson v. State,*  205 A.3d 827, 834 (Del. 2019) (quoting *McNail v. State,* 990 A.2d 398, 401 (Del. 2010)).

[73] 11 *Del. C.* § 3507(a), (b).

[74] Opening Br. at 28.

[75] *Id.* at 27 (quoting *Keys v. State*, 337 A.2d 18, 20 n.1 (Del. 1975)).

both on the events perceived and the out-of-court statement itself" was articulated by this Court in *Keys v. State*.[76] That case describes itself as "giv[ing] rise to the first interpretation by this Court of" Section 3507, which at that time was a relatively new statute.[77]

The defendant in that case, David M. Keys, was convicted of kidnapping, burglary and related offenses.[78] At trial, the State introduced two prior, out-of-court statements made by Mr. Floyd Wells.[79] They were introduced through the testimony of a City of Dover police detective and through the testimony of a deputy attorney general.[80] The statements implicated the defendant in the crime.[81] Mr. Wells was present in the courtroom when his statements were introduced, but he was not called to the witness stand by the State.[82] The defendant was offered the opportunity to call Mr. Wells to the stand but declined to do so.[83] Defense counsel objected to the admission of the out-of-court statements on the grounds that their admission violated both his constitutional right to confront the witnesses against him and the statutory protection of Section 3507.[84]

---

[76] 337 A.2d 18, 23 (Del. 1975).
[77] *Id.* at 20.
[78] *Id.*
[79] *Id.* at 20-21.
[80] *Id.* at 21.
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

On appeal, this Court found it necessary to address only the objection that was based on the language of the statute itself.[85]  It found that the admission of the out-of-court statements violated the statute for two reasons:  "the statutory language used by the General Assembly and the practicalities of a fair trial."[86]

The Court reasoned that since prior out-of-court statements were generally not admissible at trial, subject to certain exceptions, and the new statute departed from that rule, "strict construction [was] applicable"[87] and "[t]here should be a preference toward a narrow interpretation of the language in order to avoid overturning established procedures by implication not necessary from the statutory language."[88] The Court construed the statute's use of the word "witness" as indicating one who testifies at trial.[89]  It construed the phrase "subject to cross-examination" as requiring that there be a direct examination of the witness,[90] noting that "[i]n this country cross-examination has been tied to the content or at least the occurrence of direct examination."[91]  It noted that subsection (b) of the statute, which refers to "the witness'[s] in-court testimony,"[92] "clearly implie[d] a requirement of in-court

---

[85] *Id.*
[86] *Id.*
[87] *Id.* at 21-22.
[88] *Id.* at 22.
[89] *Id.*
[90] *Id.* at 23.
[91] *Id.* at 22.
[92] *Id.* at 23, quoting 11 *Del. C.* § 3507(b).

testimony by the witness."[93]  It also noted that "[t]he same implication rises from a fourth statutory phrase which says that the Statute shall apply 'with or without a showing of surprise by the introducing party.'"[94]

The Court concluded from these parts of the statute that "in order to use the out-of-court statements of Wells, in the situation presented by this case, the legislative language required the production and direct examination of the witness Wells by the prosecution."[95]  The Court then set forth the following foundational rule that continues to apply to Section 3507 statements:  "We do not mean to suggest any precise form of direct examination except that it should touch both on the events perceived and the out-of-court statement itself."[96]

After setting forth this rule, the Court discussed "the practical ebb and flow of the criminal drama."[97]  In the *Keys* case, the trial court permitted the State to offer Wells' out-of-court statements "through an officer of the law and an officer of the Court," and "shifted [the burden] to the defendant to call the witness," thus making it appear to the jury that the defense was "sponsoring the witness or refusing to sponsor him."[98]  This Court rejected that approach, stating bluntly:  "That burden is

---

[93] *Keys*, 337 A.2d at 23.
[94] *Id*. quoting 11 *Del. C.* § 3507(b).
[95] *Keys*, 337 A.2d at 23.
[96] *Id.*
[97] *Id.*
[98] *Id.* at 23-24.

not fair."[99]

Just one month later, the Court had the first occasion to apply the rule that Section 3507 requires a direct examination of the witness that touches on both the events perceived by the witness and the out-of-court statement itself in the case of *Johnson v. State*.[100]  In that case, the defendant, Marion E. Johnson, was charged with raping and assaulting a 75-year-old victim, Mrs. Florence Glass.[101]  Four out-of-court statements made by Mrs. Glass were admitted at trial.[102]  One was given to a doctor who treated Mrs. Glass shortly after the crime, and three were given to police officers who interviewed her shortly after the crime.[103]  Mrs. Glass testified at trial that she was "grabbed by a gloved hand from the rear" and that "after the attack, she staggered up the street where she passed out."[104]  She testified that "except for the one brief interval when she remember[ed] somebody doing something to her head . . . she remember[ed] nothing until late in the evening when she was offered medicine."[105]  She had no memory of the time period when she made the first three statements.[106]

---

[99] *Id.* at 24.

[100] *See* 338 A.2d 124 (Del. 1975).  This case is unrelated to the previously cited case *Johnson v. State*, 878 A.2d 422 (Del. 2005).

[101] *Johnson*, 338 A.2d at 125.

[102] *Id.* at 125-26.

[103] *Id.* at 126.

[104] *Id.* at 126-27.

[105] *Id.* at 127.

[106] *Id.*

The Court discussed both aspects of the touching-on requirements. First, the Court found that "[t]he requirement that the direct examination touch on the events perceived was satisfied, although there was limited recall."[107] The Court then turned to the requirement that the direct examination touch on the out-of-court statement itself, finding that it was sufficient for Mrs. Glass to have said that she did not recall anything about them:

> The requirement that the direct examination touch on the out-of-court statements was not expressly satisfied but Mrs. Glass did indicate that she did not recall anything during a time which includes the first three out-of-court statements noted above. She was not asked a single question about any of the statements by the defense. Thus, in effect, Keys was fully satisfied as to the first three out-of-court statements.[108]

In other words, the Court found that Mrs. Glass's testimony that she could not remember making the first three out-of-court statements touched on those statements and fully satisfied *Keys*.[109]

In *Johnson*, the Court also addressed the defendant's claim that his right to confront witnesses was violated because Mrs. Glass was not subject to cross-examination because of her limited recall.[110] The Court rejected that claim as follows:

---

[107] *Id.*

[108] *Id.*

[109] *See id.*

[110] *Id.*

> While the Statute does require that the out-of-court declarant be subject to cross examination, it does not expressly require any specific quality of cross examination or key the admission of the out-of-court statement to any particular recall in court on the part of the witness. To the contrary, the draftsmen of the Statute expressly contemplated that the in-court testimony might be inconsistent with the prior out-of-court statement. One of the problems to which the Statute is obviously directed is the turncoat witness who cannot recall events on the witness stand after having previously described them out-of-court. We conclude that there is nothing in the Statute or its intent which prohibits the admission of the statements on the basis of limited courtroom recall.[111]

The Court's reference to a turncoat witness is telling. The Court was concerned about a situation where a witness might claim not to remember or might even deny having perceived an event or having made a prior statement about an event. The Court's reasoning indicates that if a prosecutor asks a witness about an event or a prior statement and the witness cannot testify due to a lack of recall, that testimony satisfies *Keys'* requirements that the witness's testimony touch on the events perceived and the prior statement.

In 1991, the Court returned to the touching-on requirements in *Ray v. State*.[112] The case involved a sexual offense against a victim who was five years old when the offense occurred.[113] At trial, "the victim declined to respond to the prosecutor's

---

[111] *Id.*

[112] 587 A.2d 439, 443 (Del. 1991).

[113] *Id.* at 439-40.

request that she tell the jury what [the defendant] did to her.  The victim testified that she told her aunt and [a detective] what happened to her, but she declined to testify about what she told them."[114]  The prior out-of-court statements that she had made to the aunt and the detective were then admitted under Section 3507.[115]  The Court held that her testimony did not "touch on the event perceived" and it was, therefore, error to admit the prior statements.[116]  The Court "recognized[d] the difficulty involved in the presentation of the testimony of small children, particularly in sexual abuse cases[,]"[117] but explained that

> the use of hearsay statements under section 3507 must be carefully circumscribed in order to avoid, as occurred here, the only direct evidence concerning the commission of the offense against a child being presented through the testimony of third parties relating what the victim stated on a prior occasion.  The statute becomes meaningless if there is no opportunity to test the truth of the statements offered.[118]

*Ray* differs from this case in that the issue was not a failure of memory; the witness declined to answer questions.[119]  A refusal to testify is more akin to the invocation of privilege or a court-imposed limitation on examination, which have

---

[114] *Id.* at 443.
[115] *Id.*
[116] *Id.* at 443-44.
[117] *Id.* at 444.
[118] *Id.* at 444.
[119] *Id.* at 443.

been held to interfere with the constitutional right to confront witnesses[120] and should operate similarly under Section 3507. L.F. answered all questions that were asked, but with limited recall. In addition, this case does not involve third parties giving uncorroborated testimony about what L.F. said to them. The court saw L.F. herself speaking in the audio/video recording of the CAC interview.

The Court most recently addressed the touching-on requirements in *Woodlin v. State*, where we reaffirmed the holdings of *Keys*, *Johnson*, and *Ray*.[121] In that case, the defendant, Howard E. Woodlin, was convicted of Rape in the First Degree and other crimes for sexual assaults he committed against his daughter, Sarah, and incidents of sexual contact between Mr. Woodlin and Sarah's mother committed in Sarah's presence.[122] At trial, Sarah, then eight years old, testified that her father "did something wrong to me" and she did not want to describe it "[b]ecause it's nasty."[123] The trial court had concluded that this testimony touched upon the events described in her earlier CAC interview.[124] On appeal, Mr. Woodlin argued that no foundation had been laid about the perceived events.[125] On plain error review, this Court found that the record supported the trial court's finding.[126] His convictions were

---

[120] *See, e.g.*, *Owens*, 484 U.S. at 561-62.
[121] *Woodlin v. State*, 3 A.3d 1084, 1087-88 (Del. 2010) (en banc).
[122] *Id.* at 1084-85.
[123] *Id.* at 1088.
[124] *Id.* at 1086.
[125] *Id.* at 1089.
[126] *Id.*

affirmed.[127]

Our review of our jurisprudence under *Keys* and its progeny, and the differing view taken by our dissenting colleagues, shows that our cases have not fully clarified what the "touching on" requirements demand. Some of our decisions indicate that the "touching on" requirements are satisfied by the prosecutor calling the witness to the stand and asking questions on direct examination about those topics, regardless of whether the witness can provide substantive testimony about them, so that the defendant can confront and cross examine the witness on those topics without appearing to sponsor the witness. Other decisions imply that the "touching on" requirements mandate at least some level of substantive testimony from the witness about the events perceived and the out-of-court statement itself.

The original *Keys* decision seems to have intended the former framework. The *Keys* Court specifically noted that it was "not fair" [128] to require the defendant to call the witness and appear to sponsor their testimony rather than being able to cross-examine a witness called by the prosecutor. The *Keys* Court also specifically noted that "[i]n this country cross-examination has been tied to the content or at least the occurrence of direct examination,"[129] indicating that the intent of specifying the "touching on" requirements as necessary topics of direct examination was to ensure

---

[127] *Id.*

[128] 337 A.2d at 24.

[129] *Id.* at 22.

that the prosecutor opened the door to cross examination on those subjects.

We agree with our dissenting colleagues that some of our decisions after *Keys* can be read as requiring more. Most notably, in *Blake v. State*,[130] we noted that the fact-finder must have the ability to assess the declarant's credibility on the witness stand "'in light of all the circumstances presented . . . .'"[131] Continuing, the *Blake* Court stated, "[t]his Court has consistently and unequivocally held "a witness' statement may be introduced **only** if the two-part foundation is first established: the witness testifies about **both** the events and *whether or not they are true.*"[132] The *Blake* Court explained that this level of testimony is necessary "in order to conform to the Sixth Amendment's guarantee of an accused's right to confront witnesses against him, the [witness] must also be subject to cross-examination on the content of the statement *as well as its truthfulness*."[133]

The *Blake* Court's reference to "an accused's right to confront witnesses against him" reinforces that the "touching on" requirements are manifestations of the Confrontation Clause and should be informed by Confrontation Clause

---

[130] 3 A.3d 1077 (Del. 2010).

[131] *Blake*, 3 A3d at 1082 (quoting *Johnson v. State*, 338 A. 2d 124, 128 (Del. 1975)).

[132] *Id*. at 1083 (alteration in original) (quoting *Ray*, 587 A.2d at 443). In this case, L.F. did testify on the witness stand as to the truth of her out-of-court statements made to Ms. Sheats at the CAC. The prosecutor asked L.F.: "Do you know if you told the truth when you talked to that person in the photograph?" App. to Opening Br. at A63. L.F. responded by nodding her head and verbally affirming "Yes." *Id.*

[133] *Blake*, 3 A3d at 1083 (alteration in original) (quoting *Ray*, 587 A.2d at 443).

32

jurisprudence. As we have shown in our discussion of Confrontation Clause cases, a witness need not provide substantive testimony on a topic to be subject to cross-examination on those topics or to have the truthfulness of their testimony assessed. A factfinder can evaluate the truthfulness of a witness who gives limited testimony about or even says that they cannot recall anything about a statement or a series of events.[134] Our decision in *Johnson* and our discussion of the turncoat-witness problem confirms that a particular level of testimony is not required to lay a foundation for introducing a prior statement under Section 3507. To reiterate, we said in *Johnson* that "[o]ne of the problems to which the Statute is obviously directed is the turncoat witness who cannot recall events on the witness stand after having previously described them out-of-court.[135] A turncoat witness claims not to recall the prior statement (and sometimes not to recall the underlying events). Having taken that stance, the turncoat witness claims not to be able to give any substantive testimony about the topic. If the "touching on" requirements necessitated substantive testimony, then a prosecutor could not introduce a prior statement of a turncoat witness under Section 3507, contrary to what we described in *Johnson* as "[o]ne of the problems to which the Statute is obviously directed.[136] We believe that

---

[134] *See, e.g.*, *Owens*, 484 U.S. at 561-62; *Fensterer*, 474 U.S. at 21-22; *Johnson*, 878 A.2d at 429; *Randolph*, 878 A.2d 461, 2005 WL 1653635, at *1-2.
[135] *Johnson*, 338 A.2d at 125.
[136] *Johnson*, 338 A.2d at 127.

Section 3507 permits the introduction of a prior statement by a turncoat witness because, once the prosecutor has asked the questions and the witness has claimed not to recall, the factfinder can evaluate the truthfulness of the testimony of the turncoat witness, and the defendant can cross examine on those same topics without having to call the witness and seeming to sponsor their testimony. Those principles apply not only to a turncoat witness but to witnesses generally.

To the extent our decisions have migrated from referring to the factfinder's ability to evaluate the truthfulness of the witness's testimony to implying that the witness must testify substantively that the statement was true, we now clarify that our later decisions should not be interpreted as imposing the latter requirement. A turncoat witness purportedly cannot—and by definition will not—testify that a prior statement was true, because the turncoat witness claims not to recall the statement. What matters is that the factfinder be able to evaluate the truthfulness of the witnesses' testimony and that the defendant be able to question the witness on both the prior statement and the underlying events without having to call the witness to the stand and appear to sponsor their testimony.

We acknowledge the dissent's concern that disturbing facts about sexual abuse involving young children could lead to a results-driven outcome. We fully agree with the dissent's observation that the rules we lay down must govern how Section 3507 applies in all cases and not just to troubling cases involving the sexual

34

abuse of young children. Our concern for how Section 3507 applies across all cases, and particularly cases involving turncoat witnesses, drives our clarification of the "touching on" requirements. The dissent points out that Section 3513 is available as an alternative in cases involving child witnesses, and that point makes the implications of our jurisprudence particularly important for other types of cases, such as prosecutions involving turncoat witnesses. We also believe that our clarification will provide a more fair and predictable set of rules of the road for future cases.

Our dissenting colleagues mention three ways in which they believe that the trial court abused its discretion by finding that L.F.'s testimony sufficiently touched on the events perceived and L.F.'s out-of-court statement to the CAC interviewer. The first is that L.F.'s identification of the defendant as a "grownup" "boy" who would ride on her school bus was unaccompanied by any direct examination about how that related to the alleged sexual assault at the preschool. However, as we have explained above, the touching-on requirements do not require that any particular item of testimony be linked or connected to another item of evidence.

The second is that L.F. did not adequately explain bad touches. The dissenters argue that the prosecutor never asked L.F. what she meant by, or whether she had ever been the victim of bad touches. Nor, they argue, did the direct examination attempt to connect the "boy" on the bus to the bad touches. The touching-on

35

requirements do not require that a witness "explain" what she means by her testimony or require that one element of testimony be connected by the witness to another element of testimony. As we explain above and as we explained in *Keys*, no "precise form of direct examination" is required.[137]

The third is that the record does not support the conclusion that when L.F. testified that she had spoken to a "lady" about the bad touches, that the lady spoken to was the CAC interviewer. The dissenters do acknowledge the photograph showing L.F. and Ms. Sheats together, but contend that no one ever identified who the other person (the "lady") was or the circumstances under which the photograph was taken. However, both the photograph and Ms. Sheats were in the courtroom for all to see. After Ms. Sheats entered the courtroom to help lay a foundation for the prior out-of-court statement, and before the court ruled on the admissibility of the Section 3507 statement, it was clear for all to see that Ms. Sheats was the "lady" L.F. spoke to about bad touches.

In this case, the issue before us is whether the trial judge could, in the exercise of his discretion, have found that L.F.'s direct examination touched on the events perceived and the prior statement itself. Because L.F's testimony went beyond statements to the effect that she could not recall the events or the statement and instead provided substantive testimony that related to those topics, we conclude that

---

[137] *Keys v. State*, 337 A.2d 18, 23 (Del. 1975).

36

the trial judge was well within his discretion to admit the prior statement under Section 3507.

The trial judge found that the questions asked on direct examination did touch on the events perceived by L.F. and on the out-of-court statement. In making his rulings, the trial judge specifically mentioned the questions asked and L.F.'s answers about the man on the bus, L.F.'s identification of the defendant, and testimony regarding bad touches.

The prosecutor's line of questioning about L.F. riding on the school bus was clearly relevant and could be viewed as touching on the events perceived because in her CAC statement, when asked "[w]ho gives you touches that are not okay with you at school[,]"[138] L.F. identified the person as the "boy"[139] "teacher"[140] who "goes on the bus with Ms. Linda."[141] Throughout the rest of the CAC statement, the defendant was always referred to as the "boy teacher" and was never identified by name.

All of the questions asked on direct examination appear to have been a good faith effort on the part of the prosecutor to draw relevant testimony from L.F. in open court to the extent her inconsistency and limited recall would permit. L.F. identified

---

[138] Ct.'s Ex. 4 at 5.
[139] *Id.*
[140] *Id.*
[141] *Id.* at 6.

the defendant by pointing him out, identified him as a person she did not like, and confirmed that she had spoken with Ms. Sheats about bad touches after being shown a photograph taken when she was interviewed. In addition, during the course of L.F.'s testimony, L.F. gave the following responses to questions posed by the prosecutor:

- She saw the "grownup" "boy" from the bus in the courtroom.[142]
- She had not "talked to anybody about" the boy grownup.[143]
- She saw herself in a photograph and "remember[ed] being in that photograph or where that photograph was taken[.]"[144]
- She did not know what she was "doing when that photograph was taken[.]"[145]
- She did not know or remember what she talked to the "person in that photograph" about.[146]
- She "talk[ed] to the lady in that photograph about touches[.]"[147]
- She did not know "what touches" she told "that lady."[148]
- She "talk[ed] about bad touches" with "that lady."[149]
- She did not know what she told "that lady about bad touches[.]"[150]

---

[142] App. to Opening Br. at A59-60.

[143] *Id.* at A61.

[144] *Id.* at A62.

[145] *Id.*

[146] *Id.* at A63.

[147] *Id.* at A64.

[148] *Id.*

[149] *Id.* at A64-65.

[150] *Id.* at A65.

- She did not "talk about anyone who gave [her] bad touches" with "that lady."[151]
- She told "that lady" "about a person" "[w]hen [she] talked about bad touches[.]"[152]
- She did not know "who was that person" that she "told the lady about[.]"[153]
- She did not know whether she and "that lady in the photograph" "talk[ed] about school."[154]
- She did not "remember anything else [she] talked to that lady about[.]"[155]
- She "talked about touches" and "bad touches" with "that lady."[156]
- She did not "talk about who gave [her] bad touches" with "that lady."[157]
- She did not know whether she had "talk[ed] about any bad touches [she] had received" with "that lady."[158]

These responses given by L.F. on direct examination can be viewed as touching on both the events perceived and on the out-of-court statement itself.[159] L.F. testified about (1) being interviewed by Ms. Sheats; and (2) in the course of that interview, making statements about bad touches. By her statements, it can be understood that L.F. knew who the defendant was; did not like him; had discussed bad touches with

---

[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.* at A66.
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.*
[159] *See Keys v. State*, 337 A.2d 18, 23 (Del. 1975).

39

Ms. Sheats; and associated those bad touches with a person.

Based on this testimony, the factfinder could evaluate L.F.'s truthfulness. More importantly, the defendant could cross examine L.F. about the events and the statement to further explore her recollection and capacity for truthfulness. That is what the "touching on" requirements demand.

L.F. had limited recall, but the *Johnson* decision shows that limited recall is not an impediment. L.F. also gave simplistic answers, but that is to be expected given L.F.'s age and maturity. The requirements that the direct examination "touch both on the events perceived and the out-of-court statement itself" does not require that the questions posed and the answers given be in any precise form.[160] *Johnson* confirms that Section 3507 does not require that the witness's in-court testimony include any minimum substantive content, and the testimony of one who is unable to recall an event or a prior statement can satisfy the touching-on requirements.

Under these facts and circumstances, the trial judge did not "exceed[] the bounds of reason in light of the circumstances, or so ignore[] recognized rules of law or practice so as to produce injustice."[161] The admission of L.F.'s CAC statement was not an abuse of discretion.

---

[160] *Id.*

[161] *Thompson v. State*, 205 A.3d 827, 834 (Del. 2019) (quoting *McNail v. State*, 990 A.2d 398, 401 (Del. 2010)) (internal quotation marks omitted).

### III. No Cumulative Error Occurred

In light of our findings that no plain error or abuse of discretion occurred with respect to J.Y. and L.F.'s admitted out-of-court testimony, no cumulative error exists here.

### CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is affirmed.

**TRAYNOR**, Justice, concurring in part, dissenting in part, with **SEITZ**, Chief Justice joining:

We concur in the Majority's conclusion that the admission of J.Y.'s out-of-court statement did not violate McCrary's confrontation rights under the Sixth Amendment and that McCrary's cumulative-error claim lacks merit. We disagree, however, with the Majority's determination that the prosecution laid an adequate foundation for the admission, under 11 *Del. C.* § 3507, of L.F.'s out-of-court statement. In our view, the trial court exceeded its discretion when it admitted the statement over McCrary's objection. We would therefore reverse McCrary's conviction under Count 6—the count charging him with having unlawful sexual contact with L.F.— of the indictment.

## I

As the Majority observes, in *Keys v. State*, this Court established that a witness's out-of-court statement may be introduced under section 3507 only after the direct examination of the witness "touch[es] both on the events perceived and the out-of-court statement itself."[162] In 1991, in *Ray v. State*,[163] we recognized a further foundational requirement: the witness must offer testimony about the truth

---

[162] 337 A.2d 18, 23 (Del. 1975).
[163] 587 A.2d 439 (Del. 1991).

or falsity of the out-of-court statement. The witness need not affirm the truthfulness of the statement but must say "whether or not [it is] true."[164]

As later explained in *Blake v. State*,[165] this two-part foundation is grounded in the defendant's confrontation rights under the Sixth Amendment. Harkening back to *Johnson v. State*,[166] the *Blake* Court recognized the importance of the fact-finder's ability to assess the declarant's credibility on the witness stand "in light of all the circumstances presented . . . ."[167] The Court then summarized:

> The Sixth Amendment requires an entirely proper foundation, if the prior statement of a witness is to be admitted under section 3507 as independent substantive evidence against an accused. This Court has consistently and unequivocally held "a witness' statement may be introduced **only** if the two-part foundation is first established: the witness testifies about **both** the events and *whether or not they are true*." Accordingly, in *Ray* we held that "in order to conform to the Sixth Amendment's guarantee of an accused's right to confront witnesses against him, the [witness] must also be subject to cross-examination on the content of the statement *as well as its truthfulness*."[168]

The trial court found that the prosecution adequately laid this foundation, citing L.F.'s testimony about a "grownup[] . . . boy"[169] who rode her bus and who she identified as McCrary and her testimony about "bad touches." For the trial court

---

[164] *Id*. at 443.

[165] 3 A.3d 1077 (Del. 2010).

[166] 338 A. 2d 124 (Del. 1975).

[167] *Blake*, 3 A3d at 1082 (quoting *Johnson*, 338 A.2d at 128).

[168] *Id*. at 1083 (alteration in original) (quoting *Ray*, 587 A.2d at 443).

[169] App. to Opening Br. at A59–60.

and the Majority, this testimony sufficiently touched on the events perceived and L.F.'s out-of-court statement to the CAC interviewer. We disagree.

First, L.F.'s identification of McCrary as a "grownup[] . . . boy" who would ride on her school bus was unaccompanied by any direct examination about how that related to the alleged sexual assault at the daycare center. The Majority is not troubled by this omission because, in the CAC interview, L.F. identified her assailant as the "boy . . . on the bus."[170] But this seems like "bootstrapping" to us; in our view, the Court should not consult the evidence, the adequacy of whose foundation is under consideration, to determine whether the foundation is adequate. Our cases are clear: the appropriate foundation for the admission of a section 3507 must be laid *during direct examination*.[171] The Majority's treatment of the examination of L.F. about the boy on the bus and, in particular, its reliance on the substance of L.F.'s section 3507 statement undermines that requirement.

Second, the direct examination—both the questions asked and the answers given—regarding "bad touches" also falls short of the mark. To be sure, L.F. was asked whether she had talked to a "lady" depicted in a photograph about "bad touches."[172] Yet the prosecutor never asked L.F. what she meant by, or whether she had ever been the victim of "bad touches." Nor did the direct examination attempt

---

[170] Ct. Ex. 4 at 6.

[171] *See*, *e.g.*, *Blake*, 3 A.3d at 1081; *Keys*, 337 A.2d at 23.

[172] App. to Opening Br. at A64–66.

to connect the "boy" on the bus to the "bad touches." Once again, one must consult the CAC interview—the evidence whose foundation is supposedly being laid—to make that connection.

Third, the State, the trial court, and the Majority are satisfied that L.F.'s direct-examination testimony that she had spoken with a "lady" about the "bad touches" refer to statements to Ms. Sheats during the CAC interview. But the record[173] does not support that conclusion, that is, if the record is confined to L.F.'s direct examination and other evidence other than the CAC interview itself. During the direct examination, L.F. was shown a photograph that was marked as State's Exhibit for Identification Q. L.F. identified herself in the photograph and acknowledged that she had talked to "another person"[174] in the photograph who was later referred to as a "lady."[175] But no one ever identified who the other person (the "lady") was or the circumstances under which the photograph was taken.[176] Thus, the single thread that might have otherwise held the minimal evidentiary foundation together and support the admission of L.F.'s section 3507 statement appears to be missing.[177]

---

[173] App. to Opening Br. at A59–65.

[174] *Id.* at 63.

[175] *Id.*

[176] The only reference to the photograph's connection to the CAC interview was by the prosecutor when she asked the court: "[c]ould I have the officer take a photo of the CAC and mark it for identification to show the witness?" App. to Opening Br. at A62.

[177] The Majority is not troubled by this perceived gap in the record because "both the photograph and Ms. Sheats were in the courtroom for all to see" and because "after Ms. Sheats entered the courtroom to help lay a foundation for the prior out-of-court statement, it was clear for all to see

II

In addressing the scantiness of L.F.'s direct-examination testimony concerning the events that occurred at her school and her out-of-court statement, the Majority relies on the statement in *Johnson v. State*[178] that a witness's "limited courtroom recall" is not an obstacle to the admission of the witness's prior out-of-court statement under section 3507. To be sure, in *Woodlin v. State*, this Court explicitly "reaffirmed the 1975 holdings in *Keys*, *Hatcher*, and *Johnson*."[179] But, as we understand *Woodlin*, the "holding" to which it referred, found in the paragraph preceding this reaffirmation of *Johnson*, which quotes *Ray*—not *Johnson*—is that "a witness'[s] statement may be introduced [under section 3507] only if the two-part foundation [identified in *Keys*] is first established: [by having] the witness testif[y] about both the events and whether or not they are true."[180]

Besides that, the direct examination that preceded the admission of L.F.'s section 3507 statement was plagued by more than limited recall. She recalled nothing of the events that formed the basis of the charges leveled against McCrary

---

that Ms. Sheats was the lady L.F. spoke to about bad touches." Majority Op. at 36. We concede that the events might have transpired in this fashion, but that it is not clear on the record we have. The record does not show that the trial judge reviewed the photograph or that L.F. "acknowledge[d] . . . that she participated in the CAC interview" as found by the court. App. to Opening Br. at A74.

[178] 338 A.2d 124, 127 (Del. 1975).

[179] 3 A.3d 1084, 1088 (Del. 2010).

[180] *Id*. (brackets in original) (quoting *Ray v. State*, 587 A.2d at 443).

and nothing about—or whether she had even participated in—the CAC interview. She was not even asked whether she recalled the events that transpired at her school or whether she had ever interacted with McCrary. This testimony stands in contrast to the witness's testimony in *Woodlin*. There, the child victim remembered talking to a specifically identified CAC interviewer about "My daddy"[181] and why she had talked to the interviewer: "Because he did something wrong to me."[182] And when she was asked on direct examination why she was reluctant to explain what her father had done, she replied: "Because it's nasty."[183] Thus, the direct-examination testimony of the victim in *Woodlin* touched upon both the events surrounding the defendant's alleged criminal conduct and her out-of-court statement. Here, L.F.'s direct-examination testimony touched on neither.

But the Majority would excuse the absence of direct-examination testimony from L.F. as to the events at the preschool facility or the CAC interview by drawing an analogy between L.F. and a "turncoat" witness. This analogy is, in our view, inapt.

Admittedly, *Johnson* discusses the role section 3507 can play in the case of a "turncoat" witness, a classification that includes, in the words of *Johnson*, a "witness who cannot recall events on the witness stand after having previously described them

---

[181] *Woodlin*, 3 A.3d at 1088.
[182] *Id*.
[183] *Id*.

47

out-of-court."[184]   The Majority seizes on this description but then expands it to include a witness who "claims not to recall the prior statement (and sometimes not to recall the underlying events)."[185]   And going one step further, the Majority writes that "[h]aving taken that stance, the turncoat witness claims not to be able to give *any* substantive testimony about the topic."[186]   We respectfully submit that this takes *Johnson*'s "turncoat witness" remark out of context and ignores the traditional definition of "turncoat witness" and the experiential understanding of the problems such a witness creates.

First of all, *Johnson*'s reference to a "turncoat" as one "who cannot recall events on the witness stand,"[187] which by itself does not suggest total memory failure, feigned or actual, is sandwiched between two sentences that inform its meaning.  Immediately before the reference, *Johnson* observes that "the draftsmen of [section 3507] expressly contemplated that the in-court testimony might be *inconsistent* with the prior out-of-court statement."[188]   And immediately following the reference, the Court concludes that "there is nothing in the Statute or its intent which prohibits the admission of the statements on the basis of *limited* courtroom

---

[184] *Johnson*, 338 A.2d at 127.
[185] Majority Op. at 33.
[186] *Id.*
[187] *Id.*
[188] *Johnson*, 338 A.2d at 127.  (emphasis added).

48

recall."[189]  Thus, from our perspective, *Johnson*'s hypothetical "turncoat witness" might change her story on the stand or suffer from limited—even materially deficient—recall.  But that does not come close to describing L.F.'s direct examination during which she was not asked about what happened at the preschool facility or during the CAC interview.

To be clear, we readily acknowledge that section 3507 is appropriately used to counter a witness whose recollection of events takes an unfortunate turn from the perspective of the party who called the witness to the stand.  But the turncoat does not typically suffer from a total lack of recall about both the underlying events and her out-of-court statement as happened here.  Instead, the run-of-the-mill turncoat is "[a] witness whose testimony was expected to be favorable but who becomes (usually during trial) a hostile witness."[190]  Even the forgetful turncoat witness referred to in the *Johnson* passage quoted by the Majority has some ability, albeit "limited,"[191] to recollect the events, even if it is to deny that they occurred as originally reported.  In any event, in this case, L.F. was not a turncoat witness and was not even asked questions on direct examination sufficient to test her memory of the underlying events and her out-of-court statement.

---

[189] *Id*. (emphasis added).
[190] BLACK'S LAW DICTIONARY 1921 (11th ed. 2019).
[191] *Johnson*, 338 A.2d at 127.

## III

Our partial dissent echoes the concern this Court expressed over 30 years

ago in *Ray*:

> We recognize the difficulty involved in the presentation of the testimony of small children, particularly in sexual abuse cases. *Wheat v. State*, Del. Supr., 527 A.2d 269, 275 (1987). We have also ruled that there need not be consistency between the in-court testimony of the witness and the prior out-of-court statement. *Johnson v. State*, Del. Supr., 338 A.2d 124, 127 (1975). But the use of hearsay statements under section 3507 must be carefully circumscribed in order to avoid, as occurred here, the only direct evidence concerning the commission of the offense against a child being presented through the testimony of third parties relating what the victim stated on a prior occasion. The statute becomes meaningless if there is no opportunity to test the truth of the statements offered.[192]

This is not to say that the out-of-court statements of a child victim, who suffers

a memory loss or whose ability to testify is otherwise impaired, should not be

admissible. Indeed, this case itself demonstrates that 11 *Del. C.* §3513(b)(2)—a

statute explicitly designed to facilitate the use of the out-of-court statements of

youthful abuse victims—can be effectively employed under certain circumstances

to meet the difficulty identified in *Ray*.[193]

---

[192] *Ray*, 587 A.2d at 444.

[193] We note that, when the State offered L.F.'s out-of-court statement under section 3507 and McCrary objected, the State argued that "if the Defense's argument is that [L.F.] has not touched upon the actual event, the defendant touching her, the State would argue that there is a complete -- a total failure of memory of that part." App. to Opening Br. at A71. This, according to the State, made the statement admissible under section 3513(b)(2). The trial court, however, did not make

Oddly enough, however, the Majority's treatment of section 3507's "touching upon" requirement, which is incorporated in section 3513(b)(1), renders section 3512 (b)(2) superfluous. Why, after all, would a party avail itself of section 3513(b)(2) if its child witness's total failure of memory creates no impediment to the admission of her out-of-court statement under section 3507 or section 3513(b)(1), a result apparently countenanced by the Majority?

Leaving that curious result aside, section 3507, would ordinarily be available so long as the trial court "carefully circumscribe[s]" its use by requiring that the prosecution lay a proper foundation on direct examination of the child witness before the section 3507 statement is received in evidence. This is particularly important because section 3507, unlike section 3513, is a statute of general application; it applies to all criminal prosecutions, not just those involving victims of tender years. Relaxing the foundational burden— and we fear that the trial court's and the Majority's decisions could have that effect—may seem beneficial in the context of this case in which, because of their youth, the victims were helpless and, at best, only marginally capable of testifying in court. But the rules we lay down will apply to the next case in which section 3507 is invoked and the next one after that. It is that potential consequence that has prompted our dissent.

---

the factual findings required under section 3513(b) to support admission of the statement under section 3513(b)(2).